IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HELEN RIDDELL,

        Plaintiff,

        v.                      Civil Action No. 5:08-CV-95

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I. Introduction

A.    <u>Background</u>

Plaintiff, Helen Riddell, (Claimant), filed a Complaint on May 12, 2008 seeking Judicial

review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on September 4, 2008.[2]

Claimant filed her Motion for Summary Judgment on October 2, 2008.[3]  Commissioner filed his

Motion for Summary Judgment on October 23, 2008.[4]

B.    <u>The Pleadings</u>

    1.    <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

    2.    <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 14.

[3] Docket No. 17.

[4] Docket No. 20.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** because: 1) the ALJ properly considered and evaluated the opinion of nurse practitioner Melody Pairo; 2) the ALJ properly considered Listing 1.04A; 3) the ALJ adequately evaluated Claimant's RFC; 4) the ALJ gave appropriate weight to chiropractor treatment records; and 5) the ALJ made proper pain and credibility assessments.

2.    Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) on November 5, 2003, alleging disability since April 14, 2003, due to neck, shoulder and back problems.  (Tr. 100-104, 110, 122-123).  The claim was denied initially on May 5, 2004.  (Tr. 68-71). Thereafter, on May 13, 2004, Claimant filed for reconsideration.  (Tr. 72-73).  The claim was denied upon reconsideration on July 7, 2004. (Tr. 74-75).  Claimant filed a written request for a hearing on July 19, 2004 (Tr. 78).  Claimant's request was granted and a hearing was held on January 12, 2005.  (Tr. 79-80, 263-281).

The ALJ issued an unfavorable decision on April 28, 2005 (Tr. 55-67).  The ALJ determined Claimant was not disabled under the Act because her medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No.4 and because she has the residual functional capacity to perform a

significant range of light work.  (Tr. 66).  On May 13, 2005, Claimant filed a request for review of that determination.  (Tr. 92).  On July 19, 2005, the Appeals Council remanded the case back to an ALJ for further proceedings to include association with and determination of a new DIB claim filed by the Claimant.  (Tr. 93-95).  Thereafter, a second hearing was held on November 14, 2005.  (Tr. 282-297).  On May 10, 2006, the ALJ issued a second unfavorable decision determining again that Claimant was not disabled under the Act.  (Tr. 27-40).  Claimant filed a request for review of that determination on July 3, 2006.  (Tr. 25).   The request for review was denied by the Appeals Council on April 7, 2008.  (Tr. 5-7).  Therefore, on April 7, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    <u>Personal History</u>

Claimant was born on May 6, 1958 and was forty-four 44) years old as of the onset date of her alleged disability.  (Tr. 101).  Claimant was therefore considered a "younger person" under the age of 45 under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2008).  Claimant has an eighth grade education and past relevant work as a certified nursing assistant, home care assistant, bartender and janitor (Tr. 111, 116).

C.    <u>Medical History</u>

The following medical history is relevant to the disposition of the case:

**<u>Genesis Physician Services, Rodney Wenrich, MD, Catherine R. Horner, M.D., Melody Pairo, Nurse Practitioner (Tr. 161- 166, 171-184)</u>**
2/24/04 - Ms. Pairo diagnosed Claimant with a herniated disc at C3-C4, arm weakness and depression.  Pain medications and anti-depressants have helped slightly.
1/19/04 - Claimant reports for a follow-up for back and shoulder pain. Pain medication is prescribed and Claimant is diagnosed with arm pain and weakness of upper extremities.

10/23/03 - Claimant presents with back pain off and on for 6 mos. Pain medication is prescribed.
9/8/03 - Follow-up for cervical strain. Assessment - herniated disc.
8/21/03 - Follow-up for neck injury. Assessment - herniated disc C3-C4
7/15/03 - Follow-up for left shoulder pain.
6/5/03 - Claimant presents with neck and shoulder pain.
5/22/03 - Follow-up for neck and left shoulder pain. Claimant is held from work for two weeks.
5/6/03 - MRI results - mild straightening in the upper cervical region. No pathologic marrow signal intensity or fracture. The foramen Magnum and craniocervical junction are widely patent. There is a mild spondylotic protrusion slightly greater to the right with very slight cord contact. John Rees, M.D. finds "There is a mild cervical straightening, and mild cervical spondylosis. No severe canal or foraminal stenosis identified. There is a mild to moderate spondylotic prominence at C3-4 central and to the right.
4/25/03 - Assessment - neck strain
4/18/03 - Claimant presents with back/shoulder pain.
2/10/03 - Claimant presents with back and shoulder pain

**Julius Zant, MD, October 16, 2003 Report and MRI (Tr. 167-170)**
History - Claimant states she began to have left neck pain and left shoulder pain without any pain, numbness or parasthesias down into the arm itself but she did have some tingling in the shoulder. She states her pain is fairly constant. She states she also has associated headaches. She denies any prior episodes of this nature and states nothing seems to be making it better. She has been on Codeine and Flexeril. She had physical therapy with no relief. She states her right shoulder is starting to give her some difficult[y].

Radiological Findings - Examination of the x-rays showed no obvious disc herniation, no obvious root compression, no obvious cord compression.

Examination - She has a limited range of motion. Extension is 26, flexion is 25, lateral is 25 to the right, 26 to the left, rotates 57 to the right and 54 to the left. Gait and station: she is able to walk on heels and toes, step up and down on the stool with either foot, do a pushout against the door. She has a limited ROM of the left shoulder and some tenderness about the point of the shoulder as well. Coordination: intact. Pinprick might be slightly decreased in the right C5 as compared to the left. Otherwise, intact on sensory exam. Cranial nerves II-XII are intact.

Impression:
1. Patient with myofascial syndrome. No obvious surgical lesion or obvious root compression or cord compression.
2. Some left shoulder tendonitis, perhaps subcapsulitis.

Plan:
1. Starting her on NSAIDS, anti-inflammatory and Amitriptyline.
2. Have her see Dr. Sebastian.
3. Consider ortho evaluation.

**Peninsula Regional Medical Center ER, April 14, 2003, (Tr. 185-192)**
Claimant arrives at the emergency room complaining of upper back pain after lifting a patient at her workplace. Impression - acute myofascial strain. Claimant was instructed to ice the area and treat with Tylenol.

**Maryland DDS, Richard Travis, M.D., Consultative Examination, April 5, 2004, (Tr. 193-97)**
History - Claimant states that she had a work-related injury to her neck and left shoulder. She has been treated by a certified registered nurse practitioner as well as physical therapy and medications. She has been seen by a neurosurgeon and an MRI of the left shoulder on 5/31/03 was within normal limits. MRI of the cervical spine on 5/6/03 demonstrated multilevel spondylosis C3 through C6. She as last seen two months and was told by nurse Pairo that she cannot work.

Medications - Bextra, Celebrex, Avapro, Indocin, Azmacort inhaler, oxycodone, Lipitor, Flexeril, Mobic and Premarin.

Subjective Complaints - chronic neck and left shoulder pain.

Physical Examination - Examination of the cervical spine demonstrated negative bregmatic compression and negative Spurling's test. There is full range of motion in the cervical spine. There is global tenderness to palpation in the trapezil muscles with no spasm. Active range of motion of both shoulders is as follows: Flexion is 0 to 140 degrees. Extension is 0 to 30 degrees. Abduction is 0 to 120 degrees. Adduction is 0 to 20 degrees. Combination of Adduction and internal rotation allow her to touch to waist. There are both full and passive motions. There is global tenderness to palpation of both shoulders but with no crepitus. Dynametric hand strength is 15 pounds but that seemingly self-limited. I judged her strength in the upper extremities to be 4/5. Two-point discrimination testing is 100% accurate. Reflexes are 3+ and symmetric.

Diagnoses:
1. Probable depression.
2. Spondylosis, multiple levels cervical spine with no evidence of radiculopathy.
3. Bilateral shoulder pain and limitation of motion.

Opinions and comments - The patient can sit, stand, walk, handle objects, hear, speak and travel. There is quantifiable loss of motion. She certainly seems capable of functional activities below her limitations of motion. Her gait and station appeared normal. There is no requirement for ambulatory assist.

**Dr. Moore, Physical RFC, April 6, 2004, (Tr. 198-205)**
Exertional Limitations:
Occasionally lift and /or carry 20 pounds
Frequently lift and/or carry 10 pounds
Stand and/or walk for a total of about 6 hours in an 8-hour workday

Sit for a total of about 6 hours in an 8-hour workday
Push and/or pull - unlimited

Postural Limitations:
Never climb ladders

Manipulative Limitations:
Reaching in all directions is limited

No visual, communicative or environmental limitations.

**Robert McFarlin, M.D., Psychiatry Report, 3/2/05, (Tr. 207-14)**
Conclusion - Claimant has some complaints, which require usage of pain and other medications. Her complaints, however, tend to fall in the category of somatoform pain disorder with the interplay between feelings of depression and anxiety and the appearance of the somatoform pain symptoms. Otherwise, her mood appears to be mild anxiety and depression. Her affect is within normal limits. Her sensorium is clear at this time. Her judgment is intact. Her level of functioning is limited by the somatic sequelae of the "accident."

**MRI 6/30/05, (215-16, 251-254)**
Nurse Pairo ordered an MRI of Claimant's cervical spine and left shoulder
MRI Left Shoulder:
Findings - there is a small effusion. The marrow signal of the bones of the left shoulder is within normal limits. Osteophytes extend inferiorly from the distal end of the clavicle to approximately the acromion process causing mild attenuation of subacromial fat. There is increased signal in the supraspinatus tendon on proton density images which does not significantly brighten on T2 weighted images. No tendinous discontinuntiy or muscle retraction is seen. The biceps tendon lies in its groove.
Impression - Acromioclavicular osteophytes. Supraspinatus tendinopathy without evidence of tear.

MRI Cervical Spine:
Findings - The marrow signal of the cervical vertebrae is within normal limits. The cervicomedullary junction and cerebellar tonsils are within normal positions. The C2-3 level shows no significant abnormally. The C3-4 level shows a moderate-sized disc herniation flattening the ventral surface of the cervical cord. No abnormal signal within the cord is seen. A herniation to the right of midline causes mild to moderate right lateral recess stenosis. There is no significant left lateral recess stenosis. There is mild right foraminal stenosis caused by uncinate process and facet hypertrophy. There is no significant left foraminal stenosis. The C4-5 level shows mild disc bulging without evidence of herniation. There is no significant spinal stenosis. The C5-6 level shows a small central herniation causing mild central spinal stenosis. There is no significant lateral recess stenosis or foraminal stenosis. The C6-7 levels show no significant abnormality.

Impression - C3-4 disc herniation flattening the ventral surface of the cervical cord and extending into the right lateral recess causing mild to moderate stenosis of this recess.
August 29, 2005 Commissioner refers to Dr. Zamani consultative exam (217-219)

## **Maryland DDS, Mohammad H. Zamani, M.D., Consultative Examination, 8/25/05, (Tr. 217-19)**

Back - examination of the back revealed normal trunk alignment. She reported having a pain on palpation on lower cervical spine as well as the entire lumbrosacral area. No paravertebral spasm or tightness. No palpable mass. No redness. No swelling.

Summary/Discussion - the claimant has back pain and there is some mild limitation of motion of the back. Able to do forward flexion of back 60 degrees, lateral tilt 20 degrees, extension 10 degrees, and rotation 50 degrees with pain. Neurologically, she is intact. She has history of neck pain, but clinically there are no possible objective findings. She has been taking multiple medication, including oxycodone 5 mg, lorazepam 0.5 mg and she is also taking Mobic 7.5 mg one to two tablets a day. She has history of asthma and occasionally used an inhaler. She is on Zoloft for anxiety and depression 100 mg daily. She is taking Neurontin 300 mg four times a day and Premarin as well as Lipitor and Avapro 150 mg daily. This lady, orthopedic-wise, I feel, does not need any special treatment. I feel she us capable of working and doing activities as usual with no restriction.

## **Oechsli Chiropractic, July '04-December '04 (Tr. 221-240)**

Louis V. Oechsli, D.C. wrote to Mark Korn, Esq. outlining Claimant's treatment.
Radiology - There is a reversal of the normal cervical curvature. There is a thinning of the disc spaces at C2/3. C3/4 and C4/5. There is spondylosis at C4, 5, 6 most prominently at C5. There are rotational malpositions of the cervical and thoracic spine.

Diagnosis - Cervical/thoracic strain/sprain injuries associated with myofascitis, cervicalgia, dorsalgia and brachial neuralgia complicated by spondylosis and canal stenosis. Strain/sprain left shoulder with mild partial tendon tear at the subscapularis which has become chronic and is beginning to progress towards capsulitis.

## **Maryland DDS, Talmadge C. Reeves, M.D., Consultative Examination, 8/12/05, (Tr. 255-58**

Mental Status - Claimant is totally oriented to the time, place and situation. She is alert. She shows no evidence of any type of mental illness. She denies paranoia. She said she has trouble concentrating and her memory is short. Her affect was somewhat bland.

Axis I:       Adjustment disorder with depression
Axis II:      Borderline IQ
Axis III:     Left shoulder and back trauma
Axis IV:      Injury to her left shoulder and back
Axis V:       70

D.    Testimonial Evidence

Testimony was taken at hearings held on January 12, 2005 and November 14, 2005. The following portions of the testimony are relevant to the disposition of the case:

January 12, 2005 Hearing

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Okay, Ms. Riddell, according to what I've received you were born in May of 1958, which makes you 46 years old now. Is that correct?

A        Yes, Your Honor.

Q        And what's the last grade you finished in school?

A        Eighth.

Q        Okay. And did you ever get a GED after grade school?

A        No, Your Honor.

Q        And have you had any schooling or vocational training since grade school?

A        No, Your Honor.

Q        Okay. And you applied to have benefits begin in April of 2003. Have you worked at any job for pay since then?

A        No, Your Honor.

                    *             *             *

Q        And I understand that you left your last job because of an on-the-job injury. Is that correct?

A        Yes.

                    *             *             *

Q        Okay. Now, the, I've read the medical records. The whole idea of having a

hearing is I don't have to rely on them alone, I, I get to hear from you in person.  So now that I have that chance, Ms. Riddell, I'd appreciate it if you could tell me in your own words how your condition prevents you from being able to work, not only at your old job, but how it would prevent you from being able to do different types of work.

A     Well, I can only lift my arm so high and it hurts constantly in my shoulder, neck and down in my back.  And I have tendinitis in both arms.  And as far as reaching out and pulling or pushing it's just almost impossible.

*          *          *

Q     And do you, do you manage with the household chores like cooking and laundry and  cleaning, things like that?

A     Every once in a while I'll try to help my daughter-in-law.  I live with my son and daughter-in-law.  But on a basics, daily basis, no.  Like lifting a pot or something , a lot of times I just drop it.

Q     And how heavy would you say is, or, are the kind of pots that you've dropped?  If you could estimate.

A     I don't know, three or four pounds, maybe, I don't know.

Q     Okay.  And how do you spend your time on a typical day?

A     I get up and I eat and just take my pain medication.  And some days is better than others.  Some days it's hard to even get out of bed to function at all.  And some days I can move around some and help a little bit with some of the chores.

*          *          *

Q     Okay.   What kind of difficulties do you have if you're standing?

A       After I stand for awhile in my, in my back and stuff really starts to hurting.

Q       How long would you estimate you could stand before you'd feel the need to, to sit or lie down?

A       Probably about an hour is the longest.

Q       And what about sitting in a chair like you're in now?

A       I just have to keep continuously changing positions, up and down.

*          *          *

A       Usually about 30 minutes or so.

Q       And what is your most comfortable position?  Is it lying flat on your back or in a recliner or lying on one side?

A       Mainly a recliner with a pillow behind me.  With my legs elevated.

Q       Okay.  And do you have any difficulties with taking care of yourself as far as, as bathing or dressing?

A       Just trying to wash my hair.  I can't get this arm, this arm only goes up so.

*          *          *

Q       Okay.  Now, do you go out for errands like grocery shopping and things like that?

A       I go with my daughter-in-law.  By the time I go to Wal-Mart and walk around her I have to go back home and lay down.

Q       And do you drive?

A       Very seldom, with the medication that I take.

*          *          *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      Now, you already described to Your Honor where your pain is located at.  If you were to rate your pain on a scale of 1 to 10, 1 being no pain at all and 10 being pain bad enough to bring tears to your eyes, where would you rate your pain on a daily basis?

A      Eight.

Q      And are you noticed there are, have you noticed that there are certain activities that you do that causes the pain to increase?  And, if so, what are those activities?

A      The more active and moving around that I do it's worse.  And I can't, like I lay down, if I'm in bed over like two hours, two and a half then it's just unreal, the pain.  But about two and a half hours is about all I'm in bed day or night at a time.

*               *               *

Q      Now, you already indicated to Your Honor that you have some problems holding onto pots.  Do you have problems using your hands to do other things or holding onto other things?

A      Yeah.  Like trying to wash dishes, anything, it's just, I don't do anything very long at a time.  And, like I said, I drop a lot of stuff.

Q      And what would be an example of other things that you drop besides the pot you already described to Your Honor?

A      Sodas, Coke cans.  Dropped plates before, I mean.

*               *               *

Q      And you also indicated to Your Honor that you're taking Zoloft.  And what is that prescribed for?

A      For depression, where I hurt, and just I get to where I cry all the time and I go

through moods of yelling.  So it just helps keep me calm, I guess.  The kids ask me if I took my head pills.

Q	And how is your appetite?

A	Fairly good.

Q	And do you have any problems with your memory?

A	No.

Q	Any problems with concentration?

A	A lot of times, yes.

Q	And how would you describe your energy level most of the time?

A	Not real active.

Q	And you also indicated earlier that there are some days that you have difficulty getting out of bed.  Are there days that you spend in bed because of that?

A	Yes, there is.

Q	And let's take last week or last month, for example.  Approximately how many days would you say you were like that?

A	On a average it's about every other day I spend about all day on bed on the medication, just steadily taking it, because I hurt so bad I can't get up and function.

Q	So would it be a fair estimate to say that two to three days a week you're spending in bed?

A	Yes, ma'am.

*          *          *

REEXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

12

Q        Okay.  All right.  Could you summarize the work history please?

A        Yes.  It looks like the most recent work was as a CNA.  And that type of work is considered semiskilled at an SVP four.  The DOT considers it medium, but I believe it may have been heavy as the claimant performed it.  She indicated she lifted up to 100 pounds in that job.

Q        Yeah, I think - -

A        Which is common.

Q        I think, yeah, I think with limited mobility patients to care for.  I think that - -

A        Right.  It's common.  Then she'd been, the bartender work, and that's semiskilled at an SVP three.  The DOT considers it to be light, but I think it was medium as the claimant performed it with the stocking.  Then there's some indication she did home care.  I would say that would be the same as the CNA work.  And then the janitor, I would say that would be unskilled work and medium.

Q        Okay.  Okay, thank you.  Now, if we assume as a first hypothetical that she retains the capacity for light work as, as a general category, but with pushing and pulling with the upper extremities limited to occasional and with postural limitations that would rule any climbing of ropes, ladders or scaffolds and permit other postural functions on an occasional basis, that is, climbing of ramps or stairs, crawling, kneeling, crouching, stooping and balancing, and with overhead reaching limited to occasional, would any of those past jobs be feasible within that restriction, within that combination of restrictions?

A        Overhead reaching?

Q        Right.

A        I would think no, because I believe that even though the bartender as described by

the DOT is in the light category, I think there would be probably more than occasional overhead reaching.

Q        Okay.

A        The way it's commonly done.

Q        Right.  Okay.  That being the case, could you identify jobs at either the light or sedentary categories compatible with that combination of restrictions, assuming a hypothetical person of Ms. Riddell's age, education and past work experience?

A        Yes.  I would say there would be jobs like, say, things like electrical or electronic assemblers that are unskilled.  And I would say in the light exertional category there would be roughly 700 in Maryland and, and maybe 40,000 nationally.  I also think there would be packing jobs that are unskilled in the light category.  And I would say there must, there would be around 4500 in the state and about 450,000 nationally.  There would be, an example of a sedentary job would be like an interviewer, like a charge account clerk, for example.  There would be about 300 in the region and around 35,000 nationally.  Those would be some examples of jobs within the hypothetical limitations.

Q        Okay.  Now, I 'd like you to assume some additional, a few additional restrictions one at a time and not cumulatively.  If we assume that in addition to that profile the hypothetical person would have a need to rest in a prone or reclining position in excess of the customary breaks, my understanding is that that, that that degree of compromise of an upright work posture effectively rules out competitive employment.  Is that correct?

A        That's correct, yes.

Q        And discarding that assumption, if we assume that the, that the person would have

medically necessary absence averaging one day or more per week as a sustained average over time, would that permit unskilled competitive employment?

A     No, I think that level of absenteeism would be beyond what would be tolerated by employers.  It would be excessive.

Q     Okay.  Thank you.  All right, thank you.

                    *                    *                    *

ALJ          Okay.  All right. Thank you.  Okay, and would you like to make a closing statement?

ATTY          Your Honor, claimant has been diagnosed with depression as well as bilateral tendinitis in both of her arms, her left arm being, being more painful than her right, Your Honor.  Claimant did go for conservative treatment in the form of physical therapy, however, that did not decrease the level of her pain.  She did testify today that her pain is normally about an 8.  Your Honor, as well she testified today that she's on several heavy narcotics for her pain, Your Honor, and that these narcotics affect her ability to be able to concentrate and to be able to focus.  And they also cause her a need to lie down at least three times a day after she takes the medication, so there are two to three days during a week that she would be unable to work due to the severity of her pain, Your Honor.  So I would argue that based upon the medical evidence of record and the testimony that you've heard here today that claimant would be unable to perform less than a full range of sedentary and therefore should be found disabled.

                    *                    *                    *

November 14, 2005 Hearing

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q     Now, Ms. Riddell, we went to a hearing previously but you indicated to me that since the last hearing there are some things that have gotten worse?

A     Yeah, my neck and shoulder, arm, and even down in my back is a lot worse than what it was.

Q     Now, if you were to rate your pain on a scale of 1 to 10, 1 being no pain at all and 10 being pain bad enough to bring tears to your eyes, where would you rate your pain on a daily basis?

A     About 9.

Q     And would you say that your pain is constant or does it come and go?

A     Constant.

Q     Now, you indicated that you have pain in your neck, your shoulder, your arm and in your back.  Could you indicate to Your Honor where exactly in your neck your pain is located at?

A     It's right up in, in the back part right as it passes on, right down in here.

Q     Okay.

A     And over in my shoulder.

                    *          *          *

BY ATTORNEY:

Q     So the pain from your neck goes down into your left shoulder?

A     Yes.

Q     And you also indicated that you had pain in your arm.  Would that be your left

arm as well?

A       Yeah, left arm and shoulder.

Q       And you also indicated that you had pain in your back. Describe to Your Honor where the pain in your back is located at.

A       Just right down my spine. I, I can't point that out.

Q       Does it go all the way down your spine or is it - -

A       Midways.

Q       - - located in the middle?

A       About midways.

Q       And does the pain you have stay in your back or does it radiate to other parts of your body?

A       It's mainly in my back, arm and neck.

Q       And when you have the, when you have the pain what types of things do you do to try to relieve the pain?

A       I've got Oxycodone. I've got patches, Lipoderm patches, Neurontin, use heating pad, ice pack, change positions constantly.

*        *        *

Q       And are you able to bathe and dress yourself okay without any difficulty?

A       It's got to where I have to have some help.

Q       And what type of things do you need assistance with?

A       My daughter-in-law does my hair and does a lot of the work on my right side as far as under the arm and stuff where I'm having trouble reaching and doing now.

Q       And around the house do you take care of any of the cooking?

A       No.

Q       And you indicated at the last hearing that you cooked about two times a week. When did you stop cooking?

A       About three months ago, four months ago, something like that.

Q       And why is that, why did you stop?

A       I just hurt so bad and I just don't have the function to do with.

Q       And what do you mean you don't have the function to be able to do it?

A       Well, it just hurt and sometimes I can't even move my arm at all to - -

Q       And what about cleaning, do you do any of the cleaning around the house?

A       No, ma'am.

Q       Now, you indicated at the last hearing that you did some light dusting and things of that nature.  And when did you stop that?

A       Like I said, it's been getting worse all along.  I'd say four or five months.

Q       And why did you stop?

A       Just, the pains got worse.

                    *               *               *

Q       Okay.  Now, were you taking Zoloft during the last hearing?

A       Yes, ma'am, but I was only taking 50 milligrams.  They've added up to 100 milligrams now.

Q       And why did they increase the medication?

A       Because of the depression.

Q      And how would you describe your mood most of the time?

A      Depressed.  It's getting to where I want to just sit and cry.  I mean, you just hurt so bad after a while you just get almost to the point of tired of it.

&ast;                    &ast;                    &ast;

Q      And how would you describe your energy level most of the time?

A      Not very active.  I mean, zip.

&ast;                    &ast;                    &ast;

Q      Now, you indicated earlier that your medications make you drowsy.  Do you ever find the need to lie down during the day because of that?

A      Yes, ma'am.

Q      How often does that occur?

A      About an hour after I take my medication I got to lay down for at least an hour and a half, two hours because if not it makes me sick at my stomach, also sleepy.

Q      And how many times a day do you take your medication?

A      Four times a day.

Q      And you have to do that each time after you take your medications?

A      Yes, ma'am.

Q      And are you able to drive yourself around to appointments?

A      No, not anymore.  My, I get too nervous and shaky trying to drive and I can't, I can't turn to the left to see that good.

&ast;                    &ast;                    &ast;

Q      And approximately how often would you say that you drive in a typical week or

month?

A      Maybe about once a month.  Just when it's necessary and there's no way else.

Q      And you indicated that one of the reasons you don't drive is because of your

nerves.  Do you have any problem with panic attacks or anxiety?

A      Yes, ma'am.

Q      And how often do those occur?

A      It's getting more regular.  Maybe once or twice a day sometimes.

*           *           *

Q      Now, have you ever seen a psychiatrist?

A      Just the ones that Social Security sends me to.

Q      Okay.  And have you ever had a therapist to go for counseling?

A      No, Your Honor.

*           *           *

E.      Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

claimant's alleged impairments affect her daily life:

•      Leaves home about twice per week (Tr. 136)

•      Goes to drugstore and Wal-Mart once or twice per month (Tr. 137)

•      Needs help preparing meals (Tr. 137)

•      Helps vacuum, sweep and mop occasionally (Tr. 137)

•      Shops about twice per month (Tr. 137-138)

- Reads daily (Tr. 138)

- Watches television about three hours per day (Tr. 139)

- Takes care of the family dog (Tr. 140)

### III.  The Motions for Summary Judgment

A.   Contentions of the Parties

Claimant contends that the ALJ's decision in this case is not supported by substantial evidence on the record as a whole.  Specifically, Claimant avers the ALJ made the following errors: 1) she failed to properly consider and evaluate the opinion of certified registered nurse practitioner Melody Pairo; 2) she failed to properly consider Listing 1.04A; 3) she failed to adequately evaluate Claimant's RFC; 4) she erred by failing to give any weight to chiropractor treatment records; and 5) she erred in her pain and credibility assessments.

Commissioner maintains that substantial evidence supports the ALJ's decision that, from April 14, 2003 through May 10, 2006, Claimant could perform other work in the national economy. Specifically, Commissioner argues that:  1) the ALJ's decision is consistent with the statutory and regulatory scheme for evaluating disability claims; 2) the ALJ appropriately gave little weight to the opinion of claimant's certified registered nurse practitioner; 3) claimant did not meet Listing 1.04A; 4) the ALJ's evaluation of Claimant's RFC is consistent with the regulations; and 5) the ALJ's pain and credibility analysis is consistent with the regulations.

B.   The Standards.

1.   Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.     Judicial Review. Only a final determination of the Commissioner may receive judicial review. See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.     Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423C; <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether

the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10. Social Security - Substantial Evidence - Listed Impairment. In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment. Cook, 783 F.2d at 1168. The ALJ must identify the standard to be applied. Id. At 1173. The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts. Id.

11. Social Security - Listing. The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168. Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995) (unpublished).[5] In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing. 20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4ᵗʰ Cir. 1980).

12.     ALJ's Duty to Inquire Into the Evidence.  "[T]he ALJ has a duty to explore all relevant facts "[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate."  Walker v. Harris, 642 F.2d 712, 714 (4th Cir. 1981).  See also Cook v. Heckler, 783 F2d 1168 (4th Cir. 1986).  When failure to inquire into the additional evidence is prejudicial to the Claimant then the case should be remanded.  Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980).

13.     Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 416.927(d)(2).  See also  Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v.  U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

14.     Social Security - Treating Physician - Opinion that Claimant is Disabled.  An opinion that a claimant is disabled is not a medical opinion within the definition of 20 C.F.R. §§ 404.1527, 416.927.  A statement by a medical source that Claimant is disabled or unable to work does not mean that the Commissioner will determine that Claimant is disabled.  20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The Commissioner is responsible for making the determination whether a claimant meets the statutory definition of disability.  Id.  No special significance will

be given to the source of an opinion on issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

15.    <u>Social Security - Treating Physician - Not Entitled to Controlling Weight</u>.  When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following five factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization.  20 C.F.R. §§ 404.1527(d), 416927(d).  When benefits are denied, the ALJ must give good reasons in the notice of decision for the weight given to a treating source's medical opinion(s).  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

16.    <u>Social Security - Claimant's Credibility</u>.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

17.    <u>Social Security - Claimant's Credibility - Pain Analysis</u>.  The determination of whether a person is disabled by pain or other symptoms is a two step process.  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence

an impairment capable of causing the degree and type of pain alleged.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record.  Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).

18.    Evidence Considered in Evaluating the Intensity and Persistence of Claimant's Symptoms and Determining the Extent to Which Claimant's Symptoms Limit Her Capacity for Work.  The Commissioner will take into account all of the following information when assessing a Claimant's subjective complaints of pain: information that Claimant, Claimant's treating or examining physician or psychologist, or other persons provide about Claimant's pain or other symptoms; any symptom-related functional limitations and restrictions which Claimant, Claimant's treating or examining physician or psychologist, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence; all of the evidence presented, including information about Claimant's prior work record, Claimant's statements about her symptoms, evidence submitted by Claimant's treating physician or psychologist, and observations by our employees and other persons; and factors relevant to Claimant's symptoms such as, (i) daily activities, (ii) location, duration, frequency and intensity of pain and other symptoms, (iii) precipitating and aggravating factors, (iv) type, dosage and side effects of pain medication Claimant takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, Claimant receives or has  received for relief of pain or other symptoms, (vi) any measure Claimant uses or has used to relieve pain or other symptoms, and (vii) other factors concerning Claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

19.    Social Security - Residual Functional Capacity.  A Residual Functional Capacity

is what Claimant can still do despite her limitations.  20 C.F.R. §§ 404.1545, 416.945.  Residual

Functional Capacity is an assessment based upon all of the relevant evidence.  <u>Id</u>.  It may include

descriptions of limitations that go beyond the symptoms, such as pain, that are important in the

diagnosis and treatment of Claimant's medical condition.  <u>Id</u>.  Observations by treating

physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations

may be used.  <u>Id</u>.  These descriptions and observations must be considered along with medical

records to assist the SSA to decide to what extent an impairment keeps a Claimant from

performing particular work activities.  <u>Id</u>.  This assessment is not a decision on whether a

Claimant is disabled, but is used as the basis for determining the particular types of work a

Clamant may be able to do despite their impairments.  <u>Id</u>.

C.     <u>Discussion</u>

1.     <u>The ALJ Failed to Properly Consider and Evaluate the Opinion of Certified</u>
       <u>Registered Nurse Practitioner Melody Pairo</u>

Claimant's primary care provider was Genesis Physician Services.  The names of Drs.

Catherine R. Horner and Rodney Weinrich, along with Melody Pairo, CRNP (Certified

Registered Nurse Practitioner) appear on Claimant's treatment notes.  The ALJ found that Ms.

Pairo is "not a primary medically acceptable source."  (Tr. 37).  The ALJ opined that Ms. Pairo's

opinions could be used only "to show the severity of an impairment and how it affects the ability

to work."  (Id.).

Claimant argues that the ALJ's assessment of Ms. Pairo's notes and opinions was

inadequate because it failed to take into consideration the treatment relationship between the

two, including its length, nature, and extent, as well as the frequency of examination, the

consistency of Ms. Pairo's opinion with the record as a whole, and how well she explained her

opinion in accordance with SSR 06-03p.

Commissioner maintains that the ALJ appropriately gave little weight to the opinion of Claimant's nurse practitioner.  Commissioner argues that acceptable medical sources are defined as licensed physicians or osteopaths.  See 20 C.F.R. § 404.1513(a)(1).  Commissioner further argues that a nurse practitioner's opinion can only be given, at most, the weight of a lay opinion. See 20 C.F.R. § 404.1513(c)(1) (stating that the Commissioner will consider residual funcational capacity assessments made by acceptable medical sources); see also 20 C.F.R. § 404.1527(a)(2) (providing that medical opinions used in deciding a claimant's residual functional capacity are statements from physicians or other acceptable medical sources); see also Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991).  Furthermore, Commissioner avers that the lay opinion of Ms. Pairo is not entitled to much weight because it is not well-supported by her own objective findings.

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements.  Id.  The opinion of Claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is

1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it will be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984).

To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that the impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. 458, 461 (1983); 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1. (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). See also Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

At the outset, it is noted that Ms. Pairo is a nurse practitioner, and, therefore, is not an

acceptable medical source.  <u>See</u> 20 C.F.R. § 416. 913.[6]  However, in <u>Gomez v. Chater</u>, 74 F.3d

967, 972 (9th Cir. 1996), the Court held that the opinion of a nurse practitioner could be viewed

as an acceptable medical source where the record clearly established that "she was acting as an

agent" of the doctor.   In this case, the record provides no evidence to the contrary.   It is clear

that Ms. Pairo is given a significant amount of autonomy in her role as a nurse practitioner for

Genesis Physician Services.   There can be little doubt that Ms. Pairo is an agent of the doctors.

She examined Claimant on many occasions and her signature alone appears on most of

Claimant's  treatment notes.   Therefore, Ms. Pairo is considered to be an "acceptable medical

source."  However, the ALJ did not err in her consideration of this medical opinion.  In her

decision, the ALJ noted the following:

> The practitioner reported that [t]he claimant has been unable to work since April 15,
> 2003, despite reporting left abduction and lifting on ly limited to 90% and left arm
> strength 4/5.   The practitioner stated that the claimant failed physical therapy
> although she reportedly only attended four sessions.  The practitioner opined that the
> claimant could not work because of lifting.  Treatment records state that the claimant
> should avoid lifting and pulling with her left arm.   While the claimant's past work
> did involve considerable lifting, the practitioner fails to address her ability to perform
> other work.   Initially, the practitioner held the claimant from work for two weeks,
> based upon an abnormal MRI, pending neurological consultation, which was not
> completed for over two months.  Objective findings as detailed above did not support
> such a level of debilitation.   The practitioner opined that the claimant has been
> unable to work since April 15, 2003, due to complaints of constant pain, despite
> reporting 90% arm use and 4/5 strength, not clearly indicative of a disabling
> condition.  (Tr. 37-38).

"If the case record contains an opinion from a medical source on an issue reserved to the

---

[6] The term "acceptable medical sources" is defined to include (1) licensed physicians, (2)
licensed osteopaths, (3) licensed or certified psychologists, (4) licensed optometrists, (5) persons
authorized to send the Secretary a copy or summary of the medical records of a hospital or other
institution, and (6) the "report of an interdisciplinary team that contains the evaluation and
signature of an acceptable medical source."  20 C.F.R. § 416. 913 (a).

Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Social Security Ruling (SSR) 96-5p at *3. The ALJ undertook such an analysis here. It is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. <u>Id</u>. The Court's review reveals that the ALJ reasonably resolved all such conflicts and that the record more than adequately bears out her conclusions.

The ALJ properly determined that Ms. Pairo's opinions were inconsistent with the record as a whole and instead chose to rely more favorably upon the opinions of Dr. Moore, Dr. Travis and Dr. Zamani. Dr. Moore opined that the Claimant retained the ability to perform a restricted range of light work. (Tr. 199-205). <u>See</u> 20 C.F.R. § 404.1527(f)(2)(i) (providing that state agency physicians are highly qualified physicians who are also experts in Social Security disability evaluation). Dr. Travis opined that Claimant was capable of working to the extent that she could perform "functional activities below her limitations of motion." (Tr. 194). Finally, Dr. Zamani concluded that Claimant "is capable of working and doing activities as usual with no restriction." (Tr. 219).

2.    <u>The ALJ Failed to Properly Consider Listing 1.04A</u>

The ALJ found that Claimant's herniated disc at C3-4 failed to satisfy Listing 1.04A because "[t]here was no evidence of nerve root compression, arachnoiditis, or

32

pseudoclaudication." (Tr. 34). Claimant argues that the ALJ's conclusion was improper because there is evidence in the record to show nerve root compression. Commissioner maintains that while there may be some evidence to support Claimant's contention that she meets Listing 1.04A, the ALJ's decision is nevertheless supported by substantial evidence.

In order to be presumed disabled under Listing 1.04A, a claimant must show the following:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of nerve root (including the cauda equina) or the spinal cord with:
>
> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

A cervical spine MRI dated June 30, 2005 revealed a herniated disc at C3-4 with flattening of the ventral surface of the cervical cord causing mild to moderate canal stenosis. Left arm weakness is also documented in the Genesis records. (Tr. 171, 172, 176). Finally, Dr. Zant noted limited range of motion in the left shoulder, trace reflexes in the upper extremity and decreased pinprick in the right C5. (Tr. 167). Claimant argues that this evidence supports a conclusion that she is disabled in accordance with Listing 1.04A and the ALJ erred by not specifically rejecting these findings.

The issue is whether this evidence constitutes substantial evidence in light of the entire medical record. In reviewing the decision of the ALJ, the Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907

F.2d 1453, 1456 (4th Cir. 1990). The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Commissioner. Id. Weighing conflicting evidence from medical experts is exactly what the ALJ is required to do. See Books v. Chater, 91 F3d 972, 979 (7th Cir. 1996)(pointing out that when assessing conflicting medical evidence from medical experts, an ALJ must decide, based on several considerations, which doctor to believe).

In this case, the ALJ reviewed the entire medical record before him. Specifically, she noted Dr. Zant's finding that Claimant's diagnostic studies "showed no obvious disc herniation, no obvious root compression, [and] no obvious cord compression." (Tr. 34, 167, 169). The ALJ further noted the findings of Dr. Travis and Dr. Zamani which further support her conclusion that Claimant does not meet the requirements of Listing 1.04A. (Tr. 34).

Because it is the duty of the ALJ, not the courts, to make findings of fact and resolve conflicts in the evidence, the scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Hays v. Sullivan, 907 F.2d at 1456. After reviewing the record, the Court finds that the ALJ properly evaluated the medical evidence of record and, therefore, her finding was supported by substantial evidence. Accordingly, the ALJ did not err when she found that Claimant did not meet Listing 1.04A.

3.      The ALJ Failed to Adequately Evaluate Claimant's RFC

Claimant argues that the ALJ's finding that she retained the RFC to perform light work is inadequate because it was based in large part upon the opinion of the non-treating, non-examining state agency medical consultant. Claimant argues that this opinion dated April 6,

2004, predated much of the evidence in the record, including the cervical spine MRI test results of June 30, 2005. Claimant believes that the ALJ should have requested an updated RFC assessment from a state agency medical consultant, rather than relying on an outdated RFC assessment by a non-treating, non-examining state agency medical consultant.

Commissioner avers that Claimant's argument warrants little consideration because contrary to Claimant's contention, the ALJ considered all the relevant evidence of record, including Claimant's subjective complaints of pain, the information from her nurse practitioner, the objective diagnostic findings, and the evidence from Drs. Moore, Travis and Zamani before determining Claimant had the residual functional capacity for light work with limitations on postural movements and overhead reaching. (Tr. 36-38, Finding No. 5).

Once it is determined that a claimant has a severe impairment, yet the impairment does not meet a listing, the Commissioner must determine whether the Claimant has the RFC to perform her past relevant work. Should the determination find that Claimant cannot perform her past work, then a determination is made, based on her RFC, if there are jobs in the national economy that Claimant can perform despite her limitations. An RFC is what a claimant can do despite her limitations. 20 C.F.R. § 404.1545. It is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical conditions. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. This

35

assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite her impairments. Id.

The Regulations define light work as the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The Regulations further provide that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id. A person must "have the ability to do substantially all of these activities" for an ALJ to find her capable of a significant amount of light work. Id.

In this case, the ALJ determined that Claimant has the RFC "to perform light exertional work, lifting and carrying ten pounds frequently and twenty pounds occasionally, standing or walking six hours in an eight-hour day, sitting six hours in an eight-hour day, with no climbing ladders, ropes, or scaffolding, occasional postural activities, limited overhead work with upper extremities, and limited to unskilled work." (Tr. 36). The ALJ made this assessment based on several factors including the objective medical evidence as well as Claimant's own testimony.

It is the duty of the ALJ to resolve conflicts in the evidence; whereas it is the duty of this Court to determine whether the Commissioner's findings are supported by substantial evidence. Hayes, 907 F.2d at 1456. In this case, the ALJ's RFC determination was supported by substantial evidence. The ALJ did not find the Claimant to be entirely credible regarding her impairments and their impact on her condition. For example, the ALJ noted that "[t]he record fails to provide any objective medical evidence that the claimant's impairments are as severe as

her hearing testimony and allegations indicate. The record fails to show the claimant requiring any hospitalizations, significant active treatment or significant office care other than for limited routine medical maintenance, and there have been no significant increases or changes in prescribed medications reflective of an uncontrolled condition. The record indicates only limited and conservative treatment of her impairments." (Tr. 37).

This Court cannot say that, in light of the evidence of record and the evidence outlined in the ALJ's decision, there was not substantial evidence foe the ALJ's determination of Claimant's RFC. Therefore, the ALJ did not err when he found that Claimant had the RFC to perform light exertional work.

### 4. The ALJ Failed to Give any Weight to Chiropractor Treatment Records

Claimant argues that the ALJ erred by completely discounting the treatment records from her chiropractor, Louis V. Oechsli, D.C. Commissioner maintains that the ALJ gave proper weight to the chiropractor evidence.

A Chiropractor "does not qualify as an 'acceptable medical source' to make a 'medical assessment' on a Social Security claimant's ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling. At best [a chiropractor's] assessment can qualify only as a layman's opinion." Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991) (citing 20 C.F.R. § 416.913).

In her brief, Claimant directs this Court to the argument she made to the Appeals Council. Specifically, Claimant directs the Undersigned to a letter, apparently written by her attorney, Anthony Mignini, to Terry McNair, a legal assistant with the Social Security Administration Appeals Council. In this letter, Mr. Mignini outlines what he believes the

chiropractor found regarding Claimant's impairments.  Furthermore, Claimant correctly points

out that a chiropractor is an acceptable other source to show the severity of an individuals's

impairment(s) and how it affects the individual's ability to do work.  20 C.F.R. § 404.1513(d)(1).

The ALJ correctly notes that the Chiropractor records "were inconclusive as there was

only initial evaluation, plan for treatment, and documentation of that treatment.  There was no

summary of the results and no opinion as to the claimant's functionality.  Moreover, there was

nothing in the evidence by the Chiropractor to show the severity of Claimant's impairments or

how it affects her ability to do work."  (Tr. 38).  Therefore, the ALJ gave proper weight to the

Chiropractor's opinion.

5.      The ALJ Erred in Her Pain and Credibility Assessments

Claimant again directs this Court to her argument to the Appeals Council in the form of a

letter from her attorney dated June 21, 2007.  In this letter, Claimant argues that the ALJ failed to

adequately evaluate the claimant's medications and their side effects in connection with the pain

evaluation.  Commissioner argues that credibility determinations are for the ALJ to make.

Furthermore, Commissioner maintains that the ALJ here considered all of the relevant evidence

of record before concluding Claimant's subjective complaints of disabling pain were not entirely

credible, and therefore, the ALJ's determination was supported by substantial evidence.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints

of pain in Craig, 76 F.3d at 585.  Under Craig, when a claimant alleges disability from subjective

symptoms, he must first show the existence of a medically determinable impairment that could

cause the symptoms alleged.  Id. at 594.  The ALJ must next "expressly consider" whether a

claimant has such an impairment." Id. at 596.[7]  If the claimant makes this showing, the ALJ

must consider all evidence, including the claimant's statements about his symptoms, in

determining whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the

claimant's statements, he need not credit them to the extent they are inconsistent with the

objective medical evidence or to the extent the underlying objective medical impairment could

not reasonably be expected to cause the symptoms alleged.  Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility

of the claimant, the ALJ's observations concerning these questions are to be given great weight."

Shively v. Heckler, 739 F.2d 987, 889 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp.

776 (E.D. Va. 1976)).  "Because hearing officers are in the best position to see and hear the

witnesses and assess their forthrightness, we afford their credibility determinations special

deference."  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  "We will reverse an

ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers

v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir.

1990)).

The ALJ is in the best position to observe Claimant's demeanor during the hearing and

evaluate her credibility.  The ALJ stated that she had her reservations "as to whether the

claimant's assertions concerning her impairments, and their impact on her condition, can be

considered fully credible."  (Tr. 37).  The ALJ noted that the objective medical evidence failed to

show that her impairments are as severe as her hearing testimony and allegations indicate.  (Id.).

---

[7]  Claimant has made this showing here.  The ALJ stated, "the claimant's medically
determinable impairments could reasonably be expected to produce the alleged symptoms..."
(Tr. 37).

The ALJ explained that the claimant has not required any hospitalizations, significant active treatment or significant office care other than for limited routine medical maintenance and there have been no significant increases or changes in her prescribed medications reflective of an uncontrolled condition.  (Id.).  The ALJ further noted that "[p]hysical therapy records show that she attended only four [physical therapy] sessions, canceled three, and noted as a no show for one prior to being discharged." (Id.).  Furthermore, Claimant's activities of daily living indicate she prepares meals and shops (Tr. 137) as well as takes care of the family pet.  (Tr. 140).  The ALJ also gave significant weight to the 2003 neurosurgeon's report that x-rays showed no obvious herniation, no obvious root compression, and no obvious cord compression.  The doctor reported some limited range of motion in left shoulder and slightly decreased pinprick sensation at C5, with myofascial syndrome and some left shoulder tendonitis but no surgical lesions.  (Tr. 38).  Also of significant importance to the ALJ was a more current orthopedic consultative examination by Dr. Zamani which was essentially normal.  Dr. Zamani reported claimant does not need any special treatment and is capable of working and doing activities with no restrictions.  This examination was similar to an earlier exam by Dr. Travis, who reported only quantifiable loss of motion to the shoulders and no evidence of radiculopathy of the upper extremities, normal gait and station and no functional limitation of the hands or fingers.  (Tr. 38).

The Claimant did not show that the ALJ's credibility determination was patently wrong.  The ALJ complied with the mandates laid out in Craig.  Therefore, the ALJ properly analyzed Claimant's credibility and her subjective complaints of pain.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because: 1) the ALJ properly considered and evaluated the opinion of nurse practitioner Melody Pairo; 2) the ALJ properly considered Listing 1.04A; 3) the ALJ adequately evaluated Claimant's RFC; 4) the ALJ gave appropriate weight to chiropractor treatment records; and 5) the ALJ made proper pain and credibility assessments.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: February 26, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE